UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal Action No. 1:22-cr-10185-IT-6 |
| | * | |
| WEI QING ZENG, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

November 29, 2023

TALWANI, D.J.

Defendant Wei Qing Zeng is charged with conducting an unlicensed money transmitting business in violation of 18 U.S.C. § 1960 and conspiracy to launder money in violation of 18 U.S.C. § 1956(h). Indictment [Doc. No. 38]. Defendant's Motion to Suppress Evidence [Doc. No. 136] seeks to suppress location data and all other fruits of a GPS tracking device affixed to his car and evidence seized pursuant to a warrantless search of his car. Defendant contends that the government obtained the tracking warrant for his car and conducted a warrantless stop and search of his vehicle without probable cause and that the search of his vehicle was also based on the fruits of the unlawful placement of the tracking device on his car. Defendant seeks an evidentiary hearing on this motion. For the following reasons, Defendant's Motion to Suppress Evidence [Doc. No. 136] is DENIED.

I.      Background

A.      *The Money Laundering Investigation and Wiretaps*

In 2021, the Drug Enforcement Administration ("DEA") began investigating a suspected money and currency laundering operation in the Boston area. DEA investigators believed large-scale unauthorized money transmitting and money laundering (the "Target Offenses") were

occurring out of China Gourmet, a restaurant in Boston's Chinatown. Aff. in Supp. of Criminal Complaint ("Compl.") ¶¶ 8, 15-16 [Doc. No. 1-1].

Through the investigation, DEA agents were able to identify telephone numbers used by various Target Subjects and conducted Title III[1] wiretap investigations from: October 1, 2021, through October 30, 2021; November 18, 2021, through on or about December 17, 2021; and on or about February 10, 2022, through on or about March 10, 2022. Id. at ¶¶ 11-13.

Based on information obtained from the wiretaps, investigators believe that the operation out of China Gourmet provided Chinese nationals, who might otherwise be subject to China's capital flight restrictions, access to U.S. dollars ("USD"). Id. at ¶ 43. The Target Subjects allegedly "sold" those USD to Chinese nationals at a discount from the currency exchange rate between USD and Chinese Renminbi ("RMB"). Id. at ¶¶ 42-44. Customers received USD and then wired the equivalent value in RMB to Shi Rong Zhang or Qiu Mei Zeng. Id. at ¶ 44. Many of these alleged transactions took place in China Gourmet. Id. at ¶ 74-76, 79-83.

Additionally, information gleaned from the wiretaps revealed how the Target Subjects were acquiring large sums of USD, namely through the bulk sale of marijuana and bulk cash pickups—also believed to be illicit proceeds—from locations in the Brooklyn and Flushing areas of New York City. Id. at ¶¶ 17-41, 84-85, 105, 110-111, 120-122.

B.    *The Tracking Warrant Application*

On March 2, 2022, the government applied for a GPS tracking warrant to be placed on the Defendants' vehicle (the "Target Vehicle"). In support of the application, Special Agent

---

[1] Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-22, authorizes the use of electronic surveillance by law enforcement under specified conditions.

Brady O'Donnell submitted an affidavit, Aff. of Special Agent Brady O'Donnell in Supp. of

Applications ("O'Donnell Tracking Aff.") [Doc. No. 147-1], detailing the following information.

On December 8, 2021, Qiu Mei Zeng and an associate, Da Zeng, exchanged several

intercepted calls. Id. at ¶ 42. In one call, Qiu Mei Zeng asked Da Zeng if he could "line up 10 or

11 for use tomorrow." Id. Qiu Mei Zeng indicated that she did not need to pick up the "stuff"

until the next day but could send the wire that night. Id. Later, Da Zeng called Qiu Mei Zeng

back and Qiu Mei Zeng confirmed that she could pick up "10" (meaning $100,000, according to

DEA investigators) the following day if Da Zeng provided her with bank account information for

the wire. Id. at ¶ 43.

The following day, Qiu Mei Zeng called Da Zeng again and explained that her brother

(who investigators believed to be Defendant) would pick up the money. Id. at ¶ 44. Qiu Mei

Zeng then called Defendant and asked him about his plans for the day. Id. at ¶ 45. Defendant

explained that he planned to make two stops on Long Island, and two stops in Brooklyn, New

York. Id. Qiu Mei Zeng asked if he could make an additional stop in Flushing, New York to pick

up "10 units." Id. Defendant expressed concern that he would be pulled over on the highway

"like he had before." Id. Qiu Mei Zeng agreed to ask a third-party associate to perform an

additional pickup, because that associate had recently had 40 units confiscated by plainclothes

police officers. Id. Defendant responded that it was safer to transport "smaller numbers" because

there were too many informants. Id.

Based on intercepted communications between Target Subjects in which they discussed

similar trips to New York, the government inferred that Defendant made multiple bulk cash runs

into 2022, including a trip on February 23, 2022, to pick up "stuff" from either Brooklyn or

Flushing at the direction of Shi Rong Zhang. Id. at ¶¶ 48-50. And on February 28, 2022,

Defendant complained on a call with Qiu Mei Zeng about Shi Rong Zhang "ordering him to drive back and forth between Flushing and Brooklyn to pick up cash and cards." Id. at ¶ 50. Investigators inferred that this was a reference to bulk cash pickups Defendant was being directed to complete. Id. Through visual surveillance, investigators were able to identify Defendant's vehicle as a Toyota Sienna registered to Defendant at his home address and which investigators had observed him driving, including in furtherance of the Target Offenses. Id. at ¶ 10, 50, 54.

Investigators also inferred that Defendant participated in the alleged money laundering scheme by delivering blank checks to Qiu Mei Zeng that were then exchanged for cash. Id. at ¶ 51. In February 2022, investigators observed Qiu Mei Zeng arrive at China Gourmet in her vehicle. Id. at ¶ 52. Shortly after, Defendant arrived in the Target Vehicle and called Qiu Mei Zeng to let her know he was there. Id. Investigators then observed Defendant exit his vehicle and enter China Gourmet carrying a bag; two minutes later he exited the building without the bag, returned to his vehicle, and drove away. Id. After Defendant left, Qiu Mei Zeng called an unidentified woman and told her that Defendant had "dropped off a stack of checks with no names on them for over $94,000" and that the checks would be delivered to the woman. Id. at ¶ 53. Qiu Mei Zeng told the woman to take photos of the checks after writing in names and send the photos to her. Id. Investigators concluded that Defendant used his vehicle to deliver the blank checks to Qiu Mei Zeng and that those checks were used as a means of exchanging currency and laundering money. Id.

C.    *The GPS Tracking and Subsequent Stop and Search of Defendant's Vehicle*

On March 2, 2022, the magistrate judge authorized the tracking warrant. Aff. of Special Agent Brady O'Donnell in Supp. of Appl. ¶ 15 ("O'Donnell Phone Aff.") [Doc. No. 147-2].

Investigators installed a GPS tracking device on the Target Vehicle that evening while it was parked near Defendant's home. Id. at ¶ 29.

On the morning of March 3, 2022, the GPS device indicated that the Target Vehicle was traveling westbound on I-90 from Boston in the direction of New York. Id. at ¶ 30. At 11:47 a.m., Qiu Mei Zeng received a call from an unidentified caller asking if her brother was "coming to pick up." Id. at ¶ 31. She stated that he "already went down that way to pick up some merchandise" and that he would "put that thing under the merchandise." Id. Investigators believed that Defendant was traveling to New York to pick up some merchandise for the restaurant and would likely also receive a large quantity of bulk cash that he was "planning to secrete 'under' the other merchandise." Id.

Around 2:22 p.m., GPS data placed the Target Vehicle as stopped near 28 Forsyth Street in New York, New York. Id. at ¶ 32. Roughly ten minutes later, the vehicle drove to 288 Grand Street in New York and remained there for over an hour. Id. The same unidentified caller called Qiu Mei Zeng again at 3:30 p.m. and told her that her brother "took 252 units" and directed Qiu Mei Zeng to wire the money. Id. at ¶ 33.

At 3:36 p.m., the Target Vehicle left Grand Street and headed back in the direction of Boston. Id. at ¶ 34. At 7:38 p.m., Qiu Mei Zeng called Defendant who indicated that he would be there (presumably Boston) around 9:00 p.m. Id. at ¶ 35. Qiu Mei Zeng told Defendant to be careful on the road and suggested that he bring the "stuff" back to China Gourmet. Id.

Around 9:00 p.m., investigators stopped the Target Vehicle on I-90. Id. at 36. Investigators searched the vehicle and found boxes of frozen meats and seafood and, underneath the meat in one of the boxes, a plastic bag containing roughly $250,000 in cash. Id. at ¶¶ 36-39. Inside the car investigators also found bank documents and receipts from a meat market located

at 288 Grand Street and from 28 Forsyth Street, New York, the same addresses where the Target Vehicle had stopped earlier that day. Id. at ¶ 39. Investigators seized both the $250,000 and the receipts as evidence of the Target Offense. Id.

The vehicle also contained a cell phone in a phone holder near the radio. Id. at ¶ 40. Investigators called Defendant's mobile number and observed that the phone in the vehicle rang. Id. Believing that the phone was used to communicate with Qiu Mei Zeng and Shi Rong Zhang in furtherance of the Target Offenses, and to prevent the loss or destruction of evidence while obtaining a warrant, investigators also seized the phone. Id.

Defendant denied knowledge or ownership of the cash in the vehicle and made no other statement. Id. at ¶ 38. After the phone, cash, and receipts were seized, the tracking device was removed, and Defendant was released. Id. at ¶ 40.

## II.    Discussion

Defendant moves to suppress evidence obtained pursuant to the March 2, 2022 tracking warrant for the Target Vehicle, including the location data, and the March 3, 2022 stop and search of his vehicle, including the currency, cell phone, and documents seized during that stop. See Mot. to Suppress Evid. [Doc. No. 136]. Defendant primarily contends that the government lacked probable cause for both the GPS tracking warrant and the stop and search of his car.

The Fourth Amendment to the United States Constitution provides that no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized. U.S. Const. amend. IV. "'A warrant application must demonstrate probable cause to believe that (1) a crime has been committed— the "commission" element, and (2) enumerated evidence of the offense will be found at the place

searched—the so-called "nexus" element.'" United States v. Dixon, 787 F.3d 55, 59 (1st Cir.

2015) (quoting United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)).

The probable cause inquiry is a "practical, common-sense one that takes into account the

totality of the circumstances." Id. (internal quotation marks and citations omitted). In making the

probable cause determination, the "issuing magistrate ordinarily considers only the facts set forth

in supporting affidavits accompanying the warrant application." United States v. Zayas-Diaz, 95

F.3d 105, 111 (1st Cir. 1996). However, the probable cause showing "leaves ample room for

reasonable inferences based on common experience: an affidavit submitted to show probable

cause need not point to some straight-line connection but, rather, may rely on the affiant's

connecting of a series of dots in a commonsense way." United States v. Adams, 971 F.3d 22, 32

(1st Cir. 2020) (citing Florida v. Harris, 568 U.S. 237, 244 (2013)); see also id. ("A showing of

probable cause may be premised on either direct or circumstantial evidence or some combination

of the two"). A warrant application establishes probable cause for the commission element when

the facts presented to the magistrate "warrant a man of reasonable caution" to believe a crime has

been committed. Feliz, 182 F.3d at 86.

A reviewing court must examine the affidavit in support of the warrant in a "practical,

commonsense fashion" and give "considerable deference" to the magistrate's finding that the

information contained therein satisfied the probable cause showing. Id. (noting the focus is on

"whether the magistrate had a substantial basis for concluding probable cause existed"). Reversal

is appropriate only where a reviewing court sees "no substantial basis for concluding that

probable cause existed." Dixon, 787 F.3d at 58–59 (quoting United States v. Ribeiro, 397 F.3d

43, 48 (1st Cir. 2005)). "[D]oubtful or marginal cases in this area should be largely determined

by the preference to be accorded to warrants." <u>United States v. Ventresca</u>, 380 U.S. 102, 109 (1965).

To satisfy the nexus element a court need only find "fair probability—not certainty—that evidence of a crime will be found in a particular location based on the totality of circumstances." <u>United States v. Lindsey</u>, 3 F.4th 32, 39 (1st Cir. 2021) (internal quotation marks omitted). "The nexus between the alleged crime and place to be searched may be 'inferred from the type of crime, the nature of the items sought, … and normal inferences as to where a criminal would hide [evidence of a crime].'" <u>Id.</u> (quoting <u>United States v. Rodrigue</u>, 560 F.3d 29, 33 (1st Cir. 2009) (alteration in <u>Rodrigue</u>)). The nexus element may be satisfied even without direct evidence. <u>See</u> <u>United States v. Gonzales-Arias</u>, 946 F.3d 17, 24 (1st Cir. 2019), <u>cert. denied</u>, 140 S.Ct. 2729 (2020) (concluding that probable cause may be found even if officers never spotted illicit objects at the scene).

A. *The March 2, 2022 Tracking Warrant*

Defendant contends that the tracking warrant application failed to establish probable cause that he was engaged in criminal conduct or that evidence of criminal conduct would be found by tracking his car. Def.'s Mem. of Law in Supp. of Mot. to Suppress ("Def.'s Mem.") 4 [Doc. No. 137]. Defendant argues that (1) the only documented use of the Target Vehicle prior to the warrant application was to deliver checks to China Gourmet, and there was no indication that the check delivery was in any way criminal; and (2) the December 9, 2021 conversation in which Defendant was asked to pick up "10 units" is not a reliable indicator of criminal activity and the government's reliance on the call is based only on speculation. <u>Id.</u>

The government contends that Defendant's characterization of the search warrant application "ignores large swaths of the O'Donnell Affidavit, and downplays the criminal nature

8

of numerous facts set forth therein." Gov't's Opp'n to Def.'s Mot. to Suppress Evid. 9 ("Gov.

Opp'n") [Doc. No. 147]. Further, the government argues that Defendant admitted to participation

in criminal activity when he discussed his fear of being pulled over on the highway with Qiu Mei

Zeng. Id.

As noted, the First Circuit treats affidavits supporting warrants as presumptively valid,

see United States v. McLellan, 792 F.3d 200, 208 (1st Cir. 2015), and this court may only

reverse a magistrate judge's evaluation of a search warrant where it finds no substantial basis for

concluding there was probable cause. Here, the court finds that the magistrate judge's

determination that probable cause existed for the warrant was well-supported.

Defendant's arguments that, on their own, blank check deliveries and phone calls about

"units," "cash," and "cards" are not criminal and cannot support a warrant disregard the full

context of the O'Donnell Affidavit and the investigation it details. They also disregard

Defendant's own statements. The affidavit, produced after an 18-month long investigation that

included wiretaps and surveillance of the operation's participants, details a currency and money

laundering scheme operating out of China Gourmet. Intercepted phone calls and surveillance of

Defendant provided evidence to support investigators' belief that he was participating in the

laundering scheme by making cash pickups in New York City and by delivering blank checks to

China Gourmet. See O'Donnell Tracking Aff. ¶¶ 26, 30, 41-47, 49-50, 51-53 [Doc. No. 147-1].

The affidavit also detailed the evidence supporting investigators' belief that Defendant owned

the Target Vehicle and that he was using the Target Vehicle to perform his pickups and

deliveries. Id. at ¶ 54.

Further, the affidavit details intercepted conversations between Defendant and others in

which Defendant's own words suggest knowledge of illicit activity. For example, while

discussing a trip to New York on December 9, 2021, Qiu Mei Zeng told Defendant that she would arrange for someone else for an additional pickup, and that that individual had recently had a large amount of money confiscated by police while exchanging large bills for small bills. Id. at ¶ 45. Defendant responded that "it was safer to stay with the smaller numbers because there were too many informants." Id. Common sense suggests that people who are not engaged in criminal activity are largely unconcerned with "informants." In another conversation on February 23, 2022, Shi Rong Zhang called Defendant regarding a pickup in New York and Defendant asked if he would be picking up from the same person as before. Id. at ¶ 49. On February 28, 2022, Defendant complained to Qiu Mei Zeng that he was being directed to drive back and forth to make pickups of cash and cards in Brooklyn and Flushing. Id. at ¶ 50. Taken together and in the context of the money laundering investigation generally, it was reasonable to conclude that the affidavit established a likelihood that Defendant was engaged in criminal conduct.

The affidavit also established a nexus between the possibly criminal conduct and the Target Vehicle. In addition to surveillance that showed Defendant using the Target Vehicle when delivering the blank checks to China Gourmet, the vehicle was also registered in Defendant's name at his home address and was seen parked outside of his residence. Id. at ¶¶ 10, 54. Given that the affidavit established that the vehicle was registered to Defendant, that Defendant had used his vehicle to make deliveries for Qiu Mei Zeng and Shi Rong Zhang, and that Defendant was repeatedly directed by Qiu Mei and Shi Rong Zhang to make pickups in New York by car, the magistrate judge's conclusion that a tracking warrant on the Target Vehicle could lead to evidence of the Target Offenses was justified. Accordingly, the court finds that the March 22, 2022 tracking warrant was supported by probable cause.

B.     *The March 3, 2022 Vehicle Stop and Search*

Defendant argues that the March 3, 2022 stop was the "fruit" of the unlawful tracking

warrant and therefore must be excluded. Additionally, he contends that the investigators had no

basis to stop and search his vehicle under the Fourth Amendment. In Defendant's view, the

investigators had "no reason to believe" that his March 3 trip to New York to pick up

merchandise was not a legitimate business transaction related to China Gourmet. He contends

that it was improper for investigators to assume that vague terms used by Defendant and his

associations, namely "stuff" and "thing," and references to numerical values were nefarious. This

is especially so because the relevant conversations were being translated from Defendant's native

dialect of Fuzhounese into English, "adding an extra layer of ambiguity and heightened

opportunities for misinterpretation." Def.'s Mem. 7 [Doc. No. 137]. Moreover, Defendant argues

that even if the warrantless stop of the vehicle was justified under the reasonable suspicion

threshold, the search of the vehicle was not. Id.

A warrantless stop is lawful under the Fourth Amendment where officers have "a

reasonable suspicion of criminal activity." United States v. McDonald, 804 F.3d 497, 502 (1st

Cir. 2015). To determine whether there was reasonable suspicion, courts look to the totality of

the circumstances and "view the circumstances through the lens of a reasonable police officer."

United States v. Dapolito, 713 F.3d 141, 148 (1st Cir. 2013). Additionally, the well-established

automobile exception to the Fourth Amendment's prohibition on warrantless search and seizure

permits officers to stop and search a vehicle "where they have probable cause to believe that the

automobile contains contraband." United States v. Cruz-Rivera, 14 F.4th 32, 43 (1st Cir. 2021).

The court finds that the stop and search of the Target Vehicle on March 3, 2022, was

supported by reasonable suspicion and did not offend Defendant's Fourth Amendment rights. As

11

discussed, the O'Donnell Affidavit detailed why officers believed that Defendant was involved in transporting contraband for the money laundering operation out of China Gourmet. The information obtained through the tracking device on Defendant's vehicle[2] further supported the officers' belief that Defendant was involved in criminal activity on March 3. The tracking device showed Defendant traveling from Boston to New York City on the morning of March 3, 2022. O'Donnell Phone Aff. ¶ 30 [Doc. No. 147-2]. As discussed, Defendant had on multiple occasions been directed by Qiu Mei Zeng or Shi Rong Zhang to make pickups in New York, which officers believed were in furtherance of the Target Offenses. Id. at ¶¶ 24-27. While Defendant was driving to New York, officers intercepted a call from Qiu Mei Zeng to an unidentified person indicating that Defendant was on his way to pick up merchandise in New York and that he would put what he was picking up from the unidentified woman "under the merchandise." Id. at ¶ 31.

Officers stopped Defendant on I-90 in the Target Vehicle on his return trip to Boston after Defendant made two stops in New York. Investigators intercepted a call to Qiu Mei Zeng as Defendant left the second stop letting her know that Defendant "took 252 units" and that Qiu Mei Zeng should wire funds to complete the transaction. Based on the information gleaned from months of wiretaps, investigators had reason to believe that "252 units" referred to bulk cash and the wire transfer performed by Qiu Mei Zeng was to complete an illicit currency exchange. Investigators also believed that the "stuff" Defendant told Qiu Mei Zeng he planned to drop at China Gourmet when he returned to Boston was bulk cash, based on the timing of the phone call,

---

[2] As the court has found that the tracking warrant was supported by probable cause, Defendant's argument that the location data stemmed from the unlawful warrant is foreclosed.

Defendant's stops in New York, and Qiu Mei Zeng's request that Defendant "be careful driving" in light of past stops by plainclothes officers.

Defendant argues that the officers were not entitled to assume these pickups were criminal when it was reasonable to infer that he was picking up merchandise in New York legitimately related to the China Gourmet restaurant business. Def.'s Mem. 6-7 [Doc. No. 137]. He further argues that it was improper for the officers to infer criminality from the coded language ("thing," "stuff," "252 units") that he used in intercepted phone calls that day. Id. at 7.

While Defendant is correct that one reasonable inference could be that he was making legitimate merchandise pickups in New York that day, he disregards that it was at least equally reasonable for officers to infer that the trip to New York was in furtherance of the Target Offenses. The affidavit in support of the tracking warrant established that Defendant made repeated trips at the behest of Qiu Mei Zeng and Shi Rong Zhang to New York to make bulk cash pickups. Further, Qiu Mei Zeng's conversation with the unidentified person that Defendant would place what he picked up "under the merchandise" suggests that the item needed to be hidden and was contraband. Taken together with the phone call regarding "252 units," it was reasonable for officers to conclude that there was probable cause that Defendant was acting in furtherance of the Target Offenses on March 3, 2022.

None of Defendant's cases support a finding that probable cause did not exist here. For example, Defendant cites United States v. Encarnacion, 26 F.4th 490, 504-05 (1st Cir. 2022), for the proposition that "while persons engaged in criminal conduct may use coded language, there must be some basis to draw a conclusion that vague language pertains to criminal conduct, and not innocent conversation." Def.'s Mem. 6 [Doc. No. 137]. But Encarnacion supports precisely the kind of inference that officers made here. In that case, the defendant challenged an expert

witness who testified regarding the use of coded language in drug-trafficking investigations.

Encarnacion, 26 F.4th at 504. The First Circuit described that the expert would narrow coded

language to a range of possible meanings and would "then determine the precise meaning of the

coded language" based on the context of the investigation. Id. The court rejected defendant's

argument that the expert was unreliable because "context often informs interpretive judgments."

Id. at 505. Here, as detailed in the two affidavits by Agent O'Donnell, investigators determined

over months of investigation and observation that the coded language used by Defendant and

others likely referred to criminal conduct.

The rest of Defendant's cases are similarly unavailing and do not establish that the

officers lacked reasonable suspicion of criminal activity when they stopped the Target Vehicle

on March 3, 2022. Accordingly, the court finds that the stop of Defendant's vehicle was

supported by probable cause.

Because the stop was justified by probable cause, the officers were empowered to "search

[the] automobile and the containers within it" so long as they had probable cause to believe they

contained contraband or evidence. California v. Acevedo, 500 U.S. 565, 580 (1991). As

discussed, officers had probable cause to believe that Defendant was transporting bulk cash to

facilitate an illegal currency exchange scheme when they stopped the Target Vehicle on March

3, 2022, and cause to believe that the contraband would be hidden under merchandise. As such,

the officers were authorized to search the boxes within Defendant's vehicle. Defendant's

argument to the contrary—that officers did not obtain new information about the criminal

activity or observe weapons or contraband when the vehicle was stopped, and so had no

authority to search the car—is both unpersuasive and contrary to established law.

14

C.     *Good-Faith Exception*

The government contends that even if the court were to find no probable cause exists as to the GPS tracking warrant, the evidence obtained pursuant to the warrant on the Target Vehicle remains admissible under the "good faith" exception to the Fourth Amendment's exclusionary rule. Gov. Opp'n 13 [Doc. No. 147]. Defendant's papers do not address the good faith exception.

"The Supreme Court has clearly delineated the bounds of the good faith exception. Suppression remains appropriate: 1. '[I]f the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.' 2. '[W]here the issuing magistrate wholly abandoned his judicial role.' 3. Where the executing officer relies 'on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" United States v. Levin, 874 F.3d 316, 322 (1st Cir. 2017) (quoting United States v. Leon, 468 U.S. 897, 923 (1984)). "Furthermore, '[t]he Leon good faith exception does not apply where . . . a warrant . . .  is 'so facially deficient—i.e. in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.'" Id. (quoting United States v. Woodbury, 511 F.3d 93, 99 (1st Cir. 2007) (further citations omitted)).

The government notes that there is no claim here that the magistrate judge was not detached or neutral or that the warrant was facially deficient. It further argues that, even if one could disagree about whether the affidavit in support of the GPS tracking warrant established probable cause, it cannot be said that the affidavit was so lacking in indicia of probable cause that reliance on it was unreasonable. The court agrees. Accordingly, the evidence obtained

pursuant to the tracking warrant for the Target Vehicle is admissible where the agents in question relied upon it in good faith.

D.    *Defendant's Request for an Evidentiary Hearing*

Defendant requests an evidentiary hearing on the ground that there are disputed factual issues, "including the state of police knowledge at the time his vehicle was stopped, and the precise circumstances of the stop, such as which officers were involved and how they conducted the search of the vehicle." Mot. to Suppress Evid. 2 [Doc. No. 136]. In his memorandum in support of the motion, Defendant specifies further that the officer reports of the stop "are silent as to critical details," such as any exit orders given to or restraints placed on Defendant, where in the vehicle the confiscated items were located, the sequence in which they were found, details of the merchandise found and its packaging, the length of the stop, and the efforts officers took to locate the cash in the sealed containers. Def.'s Mem. 3 [Doc. No. 137].

A criminal defendant does not have a presumptive right to an evidentiary hearing on a motion to suppress. United States v. Citron, 724 F.3d 32, 36 (1st Cir. 2013). "A hearing is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record. Most importantly, the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996) (internal citation omitted).

The court finds an evidentiary hearing is not warranted. Defendant has not demonstrated that the facts he contends are disputed are material. He has not elucidated how, even if the court held a hearing on the specifics of the stop and search of the Target Vehicle on March 3, 2022, resolution of the disputed facts in Defendant's favor would alter the court's determination that

probable cause existed for the stop. Where Defendant has not established that any of the facts he

identifies are material to the dispute, the court finds that no evidentiary hearing is needed.

**III.     Conclusion**

For the foregoing reasons, <u>Defendant's Motion to Suppress Evidence</u> [Doc. No. 136] is

DENIED.

IT IS SO ORDERED.

November 29, 2023                                        /s/ Indira Talwani
                                                        United States District Judge